In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-08-00128-CR


______________________________




CORDARIAN HENDERSON, Appellant



V.



THE STATE OF TEXAS, Appellee




 


On Appeal from the 124th Judicial District Court


 Gregg County, Texas


Trial Court No. 35417-B




 




Before Morriss, C.J., Carter and Moseley, JJ.


Memorandum Opinion by Chief Justice Morriss



MEMORANDUM OPINION



 Charged with two counts of aggravated sexual assault of a child, Cordarian Henderson's
defensive theory was that his eight-year-old victim had made up these allegations of sexual abuse
as a result of having a fanciful imagination--an imagination that was the unfortunate product of
being physically abused by his mother and of having what seemed to be unfettered access to
pornographic videos. But for the pornography and being abused by his mother, the victim would
never have "made up" these claims against Henderson--or so went Henderson's theory of the case. 

 Henderson's jury disagreed with this defensive theory and found Henderson guilty of two
counts of aggravated sexual assault. The jury assessed his punishment at ten years' imprisonment
on each count. Henderson now appeals, claiming that the evidence is insufficient to support his
conviction and that his ten-year sentences are disproportionate to his crimes. We overrule both
issues and affirm the trial court's judgment.

(1) The Evidence Is Legally and Factually Sufficient To Support the Jury's Verdict

 Henderson contends the evidence is legally and factually insufficient to establish that he
committed either of the two counts of aggravated sexual assault for which the jury found him guilty. 
 A legal sufficiency review requires an appellate court to ask "whether, after viewing the
evidence in the light most favorable to the prosecution, any rational trier of fact could have found
the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307,
319 (1979). This standard mandates that the reviewing court accord deference to the fact-finder's
duty to resolve conflicts in testimony and other evidence. Clayton v. State, 235 S.W.3d 772, 778
(Tex. Crim. App. 2007). This review standard requires an examination of all the evidence, both that
which was properly admitted and that which was improperly admitted, to determine whether the
cumulative force of all the evidence (direct, circumstantial, or both) supports the verdict when such
evidence is viewed in the light most favorable to that verdict. Id.; see also Williams v. State, 235
S.W.3d 742, 750 (Tex. Crim. App. 2007). During this review process, the court measures the
evidence against the elements of the offense as defined in a hypothetically correct jury charge for the
case. Malik v. State, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The hypothetically correct jury
charge "sets out the law, is authorized by the indictment, does not unnecessarily increase the State's
burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the
particular offense for which the defendant was tried." Id.

 A factual sufficiency review has subtle differences. "Evidence may be factually insufficient
if: '1) it is so weak as to be clearly wrong and manifestly unjust or 2) the adverse finding is against
the great weight and preponderance of the available evidence.'" Berry v. State, 233 S.W.3d 847, 854
(Tex. Crim. App. 2007) (quoting Johnson v. State, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000)). "Such
a factual sufficiency review requires the reviewing court to consider all of the evidence." Id. (citing
Marshall v. State, 210 S.W.3d 618, 625 (Tex. Crim. App. 2006)). "A clearly wrong and unjust
verdict occurs where the jury's finding is manifestly unjust, shocks the conscience, or clearly
demonstrates bias." Id. (citing Sells v. State, 121 S.W.3d 748, 754 (Tex. Crim. App. 2003);
Santellan v. State, 939 S.W.2d 155, 164 (Tex. Crim. App. 1997)). As in a legal sufficiency review,
the hypothetically correct jury charge construct is employed in assessing the factual sufficiency of
the evidence. Vega v. State, 267 S.W.3d 912, 916 (Tex. Crim. App. 2008).

 One way in which the crime of aggravated sexual assault can be committed is if the actor
intentionally or knowingly causes the penetration of the anus or sexual organ of a child by any means
and the victim is younger than fourteen years of age. Tex. Penal Code Ann. § 22.021(a)(1)(B)(i), 
(a)(2)(B) (Vernon Supp. 2008). Another way the crime of aggravated sexual assault can be
committed is if the actor intentionally or knowingly "causes the sexual organ of a child to contact
or penetrate the mouth, anus, or sexual organ of another person, including the actor" and the victim
is younger than fourteen years of age. Tex. Penal Code Ann. § 22.021(a)(1)(B)(iii), (a)(2)(B). 
These two methods of committing aggravated sexual assault were alleged as alternative paragraphs
in Count I of the grand jury's indictment, the count alleging that offenses occurred April 1, 2006. 
The named victim for both alternative paragraphs was the same: John Doe 08201999. (1)

 Count II of the grand jury's indictment also contained two alternative allegations. These
alternative allegations mirrored the allegations contained in Count I of the indictment, except that
these offenses were alleged to have occurred April 15, 2006. The named victim for both paragraphs
of Count II was the same as Count I: John Doe 08201999.

 With respect to the first paragraph of either count of the indictment, the applicable
hypothetically correct jury charge would require the State to bring forth proof of the following
elements: that Henderson (1) intentionally or knowingly, (2) caused the penetration of the victim's
anus, (3) by any means, and (4) the victim was younger than fourteen years of age. See Tex. Penal
Code Ann. § 22.021(a)(1)(B)(i), (a)(2)(B). To satisfy its burden of proof under the second
paragraph of either count of the indictment, the applicable hypothetically correct jury charge would
require the State to bring forth proof that Henderson (1) intentionally or knowingly, (2) caused the
victim's sexual organ to contact the mouth, anus, or sexual organ of any person; and (3) the victim
was younger than fourteen years of age. See Tex. Penal Code Ann. § 22.021(a)(1)(B)(iii), 
(a)(2)(B). With this framework in mind, we turn now to a review of the evidence admitted at trial.

 The State called four witnesses during its case-in-chief: Doe (the victim), Nakiesta Myles,
Bunny Terrell, and David Cheatham. Henderson called six witnesses to testify on his behalf: 
Cherelle Garrett, Chere Turner Kabeta, Janice Mary Coger, Kim Robison, Stacey Lee Myers, and
Henderson himself. The jury also viewed a recorded interview of Doe conducted at the Child
Advocacy Center and a recorded interview of Henderson conducted at the Longview Police
Department. What follows is a summary of each witness' testimony and the contents of those
recorded interviews.



(a) Nakiesta Myles

 Nakiesta Myles is the mother of Doe, whose date of birth is October 20, 1999. Myles and
Doe lived in a Longview apartment complex in 2005. (2) While living at the complex, Myles met 
Robison, Henderson (who was Robison's son), and Cherelle Garrett (who was Robison's daughter). 
Robison and Henderson would alternately babysit Doe when Myles had to work. Garrett would also
sometimes babysit Myles' three children. Eventually, Henderson became Doe's primary babysitter
when Myles had to work. At some point, Myles and Doe moved into Robison's apartment. 

 One afternoon, Myles walked into Doe's room and caught him doing "inappropriate" things
with one of Myles' twin daughters. Doe then told Myles that he learned how to do this from
Henderson, who had previously done the same inappropriate thing to Doe. Doe later explained that,
while Myles had been at work, Henderson once tried to insert his penis in Doe's behind. Doe
reported to his mother that the sexual assault hurt and that Henderson would not discontinue the
assault despite Doe's muffled pleas to stop. Myles was unsure whether Doe said that Henderson
actually inserted his penis into Doe's anus or that Henderson's penis had only touched the outside of
Doe's anus. Myles' subsequent examination of her son revealed he had no observable physical
injuries to his anus, so Myles did not personally believe that Henderon had actually been able to
penetrate her son's anus; this examination occurred, however, some length of time after the last
suspected sexual assault. Myles testified that she remembered once seeing blood in Doe's stool
sometime around April 2006. 

 Henderson also reportedly made Doe watch pornographic movies. Once he was interviewed
at the Child Advocacy Center, Doe revealed the sexual assaults occurred several different times. 
According to Myles, Doe has been wetting his bed and having nightmares that involved Henderson
since the date of the last sexual assault.

(b) Doe

 Doe told the jury he was currently in third grade. He currently lives in Kilgore with his
mother, sisters, and several members of his extended family. He previously lived at an apartment
complex in Longview called Ware Meadows, at which time he was seven years old. When he lived
in Longview, Doe would sometimes go to Robison's apartment after he got home from school and
before his mother got home from work. Both Robison and Henderson would periodically babysit
Doe at either Myles' apartment or at Robison's apartment. (3) 

 Doe explained to the jury that Henderson had shown his "private part" to Doe. (4)
 Doe then told
the jury that Henderson stripped Doe of his clothes, after which Henderson put his private part "in"
Doe's anus. Doe further explained that, by using the word "in," Doe meant that Henderson actually
inserted his penis into and inside Doe's own body. The assault hurt "[a] lot." Henderson reportedly
assaulted Doe in this manner on three different occasions: first at Robison's home, later at Myles'
home (at Longview's Ware Meadows apartment complex), and at the home of Henderson's
grandmother. Doe also told the jury that he had previously watched a pornographic movie with
Henderson and Henderson's girlfriend. 

 Finally, Doe denied the claim that Henderson had touched Doe's penis during the first sexual
assault. However, with respect to the second, assaultive episode, Doe agreed that Henderson did
touch Doe's penis during that nonconsensual encounter. 

(c) Bunny Terrell

 Bunny Terrell is a medical social worker with the Child Advocacy Center in Longview. 
Terrell told the jury that her position with the Center requires her to conduct forensic interviews of
children between the ages of two and seventeen when those children have made outcries of abuse. 
Terrell explained that many of her interviews involve cases of a "delayed outcry," a term that means
"something has happened to the child and there's been a period of time before the child has revealed
that something has happened." Most often, according to Terrell, an abuser is someone who already
has a close relationship with the child. Terrell informed the jury that no sexual assault medical
examination was made of Doe in this case because he had delayed for several months before making
an outcry of sexual abuse; the passing of time would have allowed the body to heal, resulting in a
complete absence of any medically valid information to connect the accused with these alleged
sexual assaults.

 On cross-examination, Terrell told the jury that Doe has said Henderson "put his middle part
on my [Doe's] butt." (Emphasis added.)

(d) David Cheatham

 David Cheatham is a detective with the Longview Police Department. Cheatham conducted
the investigation into Doe's outcry of sexual abuse, which ultimately resulted in Cheatham's decision
to seek an arrest warrant for Henderson. When Cheatham and several other uniformed police
officers went to Henderson's home to execute that arrest warrant, they first knocked on the door to
Henderson's apartment. The officers waited "some time" before Robison finally opened the door. 
The officers then began searching throughout the home for Henderson, whom they eventually found
hiding beneath a bed. (5) Henderson was then forcibly removed from beneath the bed, handcuffed,
arrested, and transported to jail. 

 Once at the jail, Henderson agreed to waive his Miranda (6) rights and speak with officers about
the charges against him. (7) Henderson repeatedly denied molesting Doe.

 Due to the lapse of several months between the alleged incident and the child's ultimate
outcry, Cheatham decided not to send Doe for a sexual assault medical examination because "[t]here
wouldn't be any physical evidence, not normally, not after that time frame." Cheatham also informed
the jury that the State had used a pseudonym for the victim in this case, that pseudonym being "John
Doe 0820199." Cheatham's continued testimony linked this pseudonym to the child victim from
whom the jury had heard earlier.

 During cross-examination, Cheatham's police report in this case was admitted into evidence. 
Cheatham's report stated Myles initially reported that she did not believe Henderson penetrated Doe's
anus during the assault. Cheatham explained that Doe had neither, at the time of Myles' initial
report, disclosed to his mother that Henderson had actually penetrated the anus during the sexual
assault, nor exhibited any physical symptoms of such penetration. 

(e) Cherelle Garrett

 Cherelle Garrett is Henderson's younger sister. She lived with Henderson and their mother
in 2006 and frequently babysat Doe. Garrett never witnessed any type of inappropriate behavior
between Henderson and Doe during the relevant time period. She testified that she did, however,
witness an episode in which Myles physically abused Doe by beating him with a belt, kicking him,
and punching him with her fists. Garrett also testified that she witnessed Myles hit Doe's head
against a wall, which resulted in Doe suffering visible, physical injuries and caused him to miss
school the next day. Garrett claimed there were other instances of physical violence by Myles
toward her son. Garrett then testified that Doe has a reputation for being untruthful and that she has
witnessed Doe in this case watching pornographic movies. 

(f) Chere Turner Kabeta

 Chere Kabeta used to live at the Ware Meadows Apartments in Longview. Henderson
babysat Kabeta's son and daughter. Kabeta never witnessed Henderson act inappropriately with her
children during this time; she had no reason to suspect any such inappropriate conduct by Henderson. 
When the current charges were brought, Kabeta confronted her son (who was eight at the time
Henderson babysat him) about whether Henderson had similarly molested him. Kabeta's son
repeatedly denied being molested by Henderson. And other than Doe's outcry, Kabeta has never
heard molestation accusations made by any other child that Henderson previously babysat. Kabeta
would even allow Henderson to continue babysitting her children today. 

(g) Janice Mary Coger

 Janice Coger is Henderson's grandmother and lives at the Ware Meadows Apartments. Coger
testified that she witnessed Myles beating Doe, slapping him, and locking him in the trunk of her car. 
She also testified that Doe had a reputation for being "known as a big liar." Coger was unaware that
Henderson himself had been previously sexually assaulted. 

(h) Kim Robison

 Kim Robison is Henderson's mother. She lived with Henderson during the time in question
and would babysit Doe. She once found a pornographic videotape in Doe's room. Robison also
testified that Doe is known to tell lies. 

 On cross-examination, Robison admitted that she had once been raped and had waited a long
time before telling anyone about it. She also admitted that Henderson had only recently revealed to
her that he had been molested as a young child. 

(i) Stacey Lee Myers

 Stacey Myers lived at the Ware Meadows Apartments at the same time as did Henderson. 
Henderson lived with Myers for a time and took care of her teenage son when she was working. 
Myers never witnessed Henderson engage in any inappropriate behavior such as watching
pornographic videos while her children were present. 

(j) Henderson

 Henderson next testified in his own defense. He told the jury that he sometimes babysat Doe. 
Henderson testified that Doe would not behave when Henderson took care of the child. Henderson
denied molesting Doe or doing anything to hurt the child. 

 On cross-examination, Henderson told the jury that he began babysitting Doe in November
or December 2005. During the subsequent months, Henderson often spent the night at Myles'
apartment, taking care of her children while she worked. This care included taking Doe to the barber
or the mall, among other things. In exchange, Myles reportedly promised to pay Henderson $20.00
each week; Henderson was also given permission to use Myles' home telephone line and had access
to her internet service. In January 2006, Myles and Doe moved into the apartment where Henderson
and his family lived. The next month Henderson stopped babysitting Myles' children for two
reasons: First, Myles stopped giving Henderson the promised $20.00 per week payment. Second,
Henderson moved out of his mother's home and into the home of his cousin. Henderson testified
that he never had any close contact with Doe after Valentine's Day 2006. 

 Henderson next told the jury that he personally observed Doe in this case watching a
pornographic movie that Myles had absentmindedly left in her video player after a previous night's
romantic interlude. (The movie apparently got stuck in the video player; Henderson told the jury that
he had to use a butter knife to remove the disc from the video player). He also testified that he had
seen Myles physically abuse her son in December 2005 and on at least five other occasions. 

 Finally, Henderson told the jury that he had himself been sexually abused as a child and
admitted that he waited about a month before he told anyone of the incident. Because he himself had
been molested, Henderson told the jury that he would never want to put another child through the
same pain and trauma he had experienced. 

(k) Child Advocacy Interview (Defense Exhibit 1)

 Defense Exhibit 1 is a recording of Doe's interview by Terrell at the Child Advocacy Center
and lasted nearly twenty-seven minutes. At the beginning of the video, Terrell asks Doe to identify
statements that are true and statements that are false. The video suggests that Doe appropriately
identifies the difference between the truth and a lie and promises to tell the truth during the
interview. 

 Early during this interview, Doe tells Terrell that he sometimes spends the night at
Henderson's home. Terrell then asked Doe why he was at the Center. Doe responded, "He
[Henderson] put his middle part in my butt." (Emphasis added.) Doe told Terrell that he did not
have his clothes on at the time Henderson committed the assault on a bed at Henderson's home. Doe
also reportedly told Henderson to stop the assault, but Henderson would not cease. Henderson was
also reportedly wearing "red jean pants" at the time he assaulted Doe. Doe repeatedly told Terrell
that Henderson's penis went in and out of Doe's anus several times during each of the assaults that
occurred over a period of three different, consecutive days. (8) The assaults occurred at night according
to the recorded interview. 

 Doe next told Terrell that he had seen Henderson watching "nasty movies" on several
occasions that Henderson reportedly got from his cousin. Henderson also reportedly paddled Doe
on several occasions. When asked by Terrell, Doe denied being sexually assaulted by anyone else. 

(l) Henderson's Jailhouse Interview (State's Exhibit 1)

 Henderson was eighteen years of age at the time of his custodial interview by Detective
Cheatham. The video begins with Cheatham reading the Miranda warnings to Henderson, then
Henderson is given a written copy of the warnings (which he initials as an indication of his
understanding of the warnings and the consequences of waiving his Miranda rights). Henderson
acknowledges that he was hiding underneath his bed when the officers came to arrest him. 
Henderson explains that he previously babysat Myles' children, including Doe. Henderson and Doe
sometimes would go to the mall, McDonalds, or the barber shop together. Henderson repeatedly
denied molesting Doe. Henderson acknowledged owning a pornographic video. Henderson,
however, denied watching pornography with Doe or while Doe was in a location where he could see
Henderson watching pornography.

 Henderson then told Cheatham about being molested by a teenage cousin. Henderson said
the cousin performed oral sex on Henderson and attempted anal intercourse on Henderson. 

 Finally, Henderson told investigators he believed that Doe had made up these accusations
of sexual molestation as a result of Doe being repeatedly, physically abused by Doe's own mother. 


(m) Analysis

 Viewing the above-summarized evidence in the light most favorable to the jury's verdict, we
conclude  that  the  jury  had  before  it  evidence  from  which  it  could  determine  that  Henderson
 (1) intentionally or knowingly, (2) caused the penetration of Doe's anus, (3) by any means (in this
case, Henderson's penis), and Doe was younger than fourteen years of age on or about April 1, 2006. 
The jury also had before it evidence that Henderson (1) intentionally or knowingly, (2) caused the
penetration of Doe's anus, (3) by any means (in this case, Henderson's penis), and Doe was younger
than fourteen years of age on or about April 15, 2006. We therefore conclude that legally sufficient
evidence supports the jury's verdict, as evaluated under the required hypothetically correct jury
charge standard.

 We similarly conclude the evidence is factually sufficient when measured against the
hypothetically correct jury charge. While there are factual conflicts and discrepancies among the
various witnesses' testimonies and among the exhibits, it was ultimately the jury's province to resolve
these conflicts. Based on the above-summarized record, we cannot say the jury's resolution of the
facts is against the great weight and preponderance of the evidence. We therefore overrule
Henderson's challenges to the legal and factual sufficiency of the evidence to support his convictions.

(2) Henderson Did Not Preserve His Disproportionate Sentencing Claim

 In his final point of error, Henderson contends his ten-year prison sentence is
disproportionate to his crime, citing Solem v. Helm, 463 U.S. 277 (1983). 

 Texas courts have traditionally held that, as long as the punishment assessed is within the
range prescribed by the Legislature in a valid statute, the punishment is not excessive, cruel, or
unusual. See, e.g., Jordan v. State, 495 S.W.2d 949, 952 (Tex. Crim. App. 1973). Here, Henderson's
ten-year sentence falls within the applicable range of imprisonment for a term of between five and
ninety-nine years, or for life. See Tex. Penal Code Ann. § 12.32 (Vernon 2003).

 That does not end the inquiry. A prohibition against grossly disproportionate punishment
survives under the Eighth Amendment to the United States Constitution apart from any consideration
of whether the punishment assessed is within the range established by the Legislature. U.S. Const.
amend. VIII; see Solem, 463 U.S. at 290; Harmelin v. Michigan, 501 U.S. 957 (1991) (Scalia, J.,
plurality op.); Jackson v. State, 989 S.W.2d 842, 845 (Tex. App.--Texarkana 1999, no pet.); Lackey
v. State, 881 S.W.2d 418, 420-21 (Tex. App.--Dallas 1994, pet. ref'd); see also Ex parte Chavez,
213 S.W.3d 320, 323 (Tex. Crim. App. 2006) (describing this principle as involving a "very limited,
'exceedingly rare,' and somewhat amorphous" review).

 Solem had suggested, as a three-part test, that an appellate court consider: (1) the gravity of
the offense compared with the harshness of the penalty; (2) the sentences imposed for similar crimes
in the same jurisdiction; and (3) the sentences imposed for commission of the same crime in other
jurisdictions. See Solem, 463 U.S. at 292. Harmelin at least raised questions about the viability of
the Solem three-part test. In fact, it was subsequently held that proportionality survived Harmelin,
but that the Solem three-part test did not. See McGruder v. Puckett, 954 F.2d 313, 316 (5th Cir.
1992); Dunn v. State, 997 S.W.2d 885, 892 (Tex. App.--Waco 1999, pet. ref'd); Lackey, 881 S.W.2d
at 420-21. In light of Harmelin, the test has been reformulated as an initial threshold comparison
of the gravity of the offense with the severity of the sentence, and then, only if that initial comparison
created an inference that the sentence was grossly disproportionate to the offense should there be a
consideration of the other two Solem factors--(1) sentences for similar crimes in the same
jurisdiction and (2) sentences for the same crime in other jurisdictions. McGruder, 954 F.2d at 316;
Mullins v. State, 208 S.W.3d 469, 470 (Tex. App.--Texarkana 2006, no pet.); Dunn, 997 S.W.2d
at 892; Lackey, 881 S.W.2d at 420-21. 

 Henderson did not object to his sentence at the trial court level on the ground that a ten-year
prison sentence was disproportionate to his crimes (or on any other ground) at the time it was
announced or later when it was imposed. His motion for new trial, however, contains a contention
that the sentence was disproportionate to the offense. A motion for new trial is an appropriate way
to preserve this type of claim for review. See Williamson v. State, 175 S.W.3d 522, 523-24 (Tex.
App.--Texarkana 2005, no pet.); Delacruz v. State, 167 S.W.3d 904 (Tex. App.--Texarkana 2005,
no pet.).

 There is no evidence in the record, however, comparing the sentences imposed on persons
in Texas with sentences imposed against defendants in other jurisdictions who committed a similar
offense. Mullins, 208 S.W.3d at 470; Alberto v. State, 100 S.W.3d 528, 529-30 (Tex.
App.--Texarkana 2003, no pet.); see Fluellen v. State, 71 S.W.3d 870, 873 (Tex. App.--Texarkana
2002, no pet.); Latham v. State, 20 S.W.3d 63, 69 (Tex. App.--Texarkana 2000, pet. ref'd). 
Accordingly, Henderson has not brought forth a record on which this issue may be properly
evaluated, and his claim must be overruled.

 For the reasons stated, we conclude the evidence is factually and legally sufficient to support
the jury's verdict. We also hold that Henderson has not brought forth an adequate record on which
we can evaluate his claim that his ten-year prison sentence for two counts of aggravated sexual
assault is disproportionate to his crime. 

 We affirm the trial court's judgment.



 

 Josh R. Morriss, III

 Chief Justice


Date Submitted: March 23, 2009

Date Decided: April 16, 2009


Do Not Publish

 

 
1. John Doe 08201999 is a pseudonym. 
2. Myles reported her son was, at the time of trial, finishing his third-grade year of school in
Kilgore. Doe has been diagnosed with attention-deficit-hyperactivity disorder and reportedly has
had behavioral problems at school. Myles also said Doe was behind his peers in his academic level,
but that he was starting to catch up and was enjoying school. She also reported that his behavioral
problems had improved slightly during the just-ended academic term. 
3. Doe identified Henderson in open court. 
4. The record reflects that the child victim was afraid to testify at trial about the sexual assaults. 

5. During his own later testimony, Henderson tried to explain that he hid from the police
because he lived within a culture at the Ware Meadows Apartments that was generally distrustful
of police officers. He told the jury that any time the police come to that apartment complex, the
residents for whom the police are looking will generally attempt to hide. Henderson also reportedly
hid because he thought the officers were attempting to arrest him for unpaid traffic tickets. 
6. Miranda v. Arizona, 384 U.S. 436 (1966).
7. Cheatham testified that Henderson did not ask for an attorney at any time. The recording
of the interview also does not suggest Henderson made any request for an attorney, but instead
willingly waived his right to counsel and answered the detective's questions.
8. Doe would later say that Henderson "stayed still" after he put "his middle part in" Doe's
anus. Terrell did not ask Doe to clarify this apparent discrepancy among his various statements
surrounding the facts of the multiple sexual assaults described during the interview's entirety.